IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| HOWARD ROSEN,<br><br>Plaintiff,<br><br>v.<br><br>VERIZON PENNSYLVANIA, LLC,<br><br>Defendant. | CIVIL ACTION<br><br>No. 13-1722 |

### MEMORANDUM

**ROBERT F. KELLY, Sr. J.**                                                                                 **MARCH 27, 2014**

Presently before the Court is Defendant, Verizon Pennsylvania LLC's ("Verizon"), Motion for Summary Judgment filed against Plaintiff, Howard Rosen ("Rosen"), Rosen's Response, and Verizon's Reply. For the reasons stated below, the Motion is granted in part and denied in part.

**I.      BACKGROUND**

Rosen initiated this action in the Philadelphia County Municipal Court on February 21, 2013. (Doc. No. 1, Ex. A.) Verizon removed the action to this Court on April 2, 2013. (Doc. No. 1.) Verizon is a limited liability company with a principal place of business in Philadelphia, Pennsylvania, that provides telephone, cable, internet, and other related services to consumers in Pennsylvania. Am. Compl. ¶¶ 2, 4. Rosen, a Pennsylvania resident, alleges a claim against Verizon for violations under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 et. seq., and a state law claim for defamation. Id. ¶¶ 22-26.

In his Amended Complaint, Rosen asserts the following.  Prior to December 11, 2006, Rosen paid fees to Verizon in order to receive services for cable television, internet access, and landline telephone service.  Id. ¶ 5.  On May 9, 2007, AFNI, Inc. ("AFNI"), a debt collector acting on behalf of Verizon, notified Rosen of an alleged debt owed by Rosen to Verizon in the amount of $139.99.  Id. ¶ 7.  On May 16, 2007, Rosen notified AFNI that he was disputing the debt.  Id. ¶ 8.  On July 23, 2007, Rosen agreed that a portion of the debt in the amount of $76.51 was owed by him and he, subsequently, paid that amount.  Id. ¶ 10.  Rosen requested that the alleged remaining debt be marked as satisfied.  Id.  However, on November 28, 2007, another debt collector acting on behalf of Verizon, Park Dansan, notified Rosen of an outstanding debt of $78.83 and offered that Rosen pay $47.40 in full satisfaction of this alleged debt.  Id. ¶ 11.  Rosen rejected this offer on December 27, 2008, and continued to dispute the debt.  Id. 12.  Rosen never received any written or oral communication from any entity acting on behalf of Verizon following his rejection of the offer.  Id. ¶ 13.

On February 22, 2012, Rosen received his credit report in connection with seeking a home mortgage refinancing which indicated that Verizon had reported a past due balance of $78.00 in October 2008.  Id. ¶ 15.  On February 23, 2012, and March 13, 2012, Rosen reported this dispute to two credit reporting agencies.  Id. ¶¶ 16-18.  Rosen contends that Verizon's conduct of reporting this debt, despite many communications from him, "can only be explained by Defendant acting with malice and/or a willful intent to injure Plaintiff," and that this caused damage to his credit resulting in him receiving a higher interest rate in refinancing his mortgage. Id. ¶¶ 19-20.

Verizon filed the instant Motion for Summary Judgment on November 12, 2013.  (Doc.

No. 14.) Rosen filed a Response, and Verizon filed a Reply. (Doc. Nos. 15-16.)

## II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(c) states that summary judgment is proper "if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." See Hines v. Consol. Rail Corp., 926 F.2d 262, 267 (3d Cir. 1991). The Court asks "whether the evidence presents a sufficient disagreement to require submission to the jury or whether . . . one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986). The moving party has the initial burden of informing the court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "A fact is material if it could affect the outcome of the suit after applying the substantive law. Further, a dispute over a material fact must be 'genuine,' i.e., the evidence must be such 'that a reasonable jury could return a verdict in favor of the non-moving party.'" Compton v. Nat'l League of Prof'l Baseball Clubs, 995 F. Supp. 554, 561 n.14 (E.D. Pa. 1998).

Summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. Once the moving party has produced evidence in support of summary judgment, the non-moving party must go beyond the allegations set forth in its pleadings and counter with evidence that presents "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); see Big Apple BMW, Inc. v. BMW of N. Am. Inc., 974 F.2d 1358, 1362-63 (3d Cir. 1992). "More than a mere scintilla of evidence in its favor" must be presented by the non-moving party in order to overcome a

summary judgment motion.  Tziatzios v. United States, 164 F.R.D. 410, 411-12 (E.D. Pa. 1996). If the court determines that there are no genuine issues of material fact, then summary judgment will be granted.  Celotex, 477 U.S. at 322.

## III. DISCUSSION

### 1. Fair Credit Reporting Act

Congress enacted the FCRA in 1970 "to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy."  Safeco Ins. Co. of Am. v. Burr, 551 U.S. 47, 52 (2007).  "The FCRA is intended 'to protect consumers from the transmission of inaccurate information about them, and to establish credit reporting practices that utilize accurate, relevant, and current information in a confidential and responsible manner.'" SimmsParris v. Countrywide Fin. Corp., 652 F.3d 355, 357 (3d Cir. 2011) (quoting Cortez v. Trans Union, LLC, 617 F.3d 688, 706 (3d Cir. 2010)).  The FCRA imposes duties not only on credit reporting agencies ("CRAs"), but also on those who furnish information to such agencies. Id.  For example, under 15 U.S.C. § 1681s–2, a furnisher has a duty to provide accurate information to CRAs and a "duty to conduct an investigation into the completeness and accuracy of the information furnished." Id.  An individual may assert a private cause of action for violations of § 1681s–2(b), which provides in relevant part:

> (b) Duties of furnishers of information upon notice of dispute
>
> (1) In general. After receiving notice pursuant to section 1681i(a)(2) of this title of a dispute with regard to the completeness or accuracy of any information provided by a person to a consumer reporting agency, the person shall—
>
> (A) conduct an investigation with respect to the disputed information;

(B) review all relevant information provided by the consumer reporting agency pursuant to section 1681i(a)(2) of this title;

(C) report the results of the investigation to the consumer reporting agency;

(D) if the investigation finds that the information is incomplete or

inaccurate, report those results to all other consumer reporting agencies to which the person furnished the information and that compile and maintain files on consumers on a nationwide basis; and

(E) if an item of information disputed by a consumer is found to be

inaccurate or incomplete or cannot be verified after any reinvestigation under paragraph (1), for purposes of reporting to a consumer reporting agency only, as appropriate, based on the results of the reinvestigation promptly—

(i) modify that item of information;

(ii) delete that item of information; or

(iii) permanently block the reporting of that item of information.

15 U.S.C. § 1681s-2(b).

Verizon acknowledges that there is no question that Rosen notified a CRA of his dispute of the information supplied by it, and that the CRA notified Verizon of the dispute. (Def.'s Mot. Summ. J. at 21.) Verizon asserts that the only issue to be resolved with respect to the FCRA claim is whether Verizon's "investigation of the dispute was reasonable under the circumstances then and there presented by the dispute." (Id.)

Although the FCRA does not define the term "investigation," the investigation must be "a reasonable investigation" of the records of the furnisher "to determine whether the disputed information can be verified." Johnson v. MBNA Am. Bank, NA, 357 F.3d 426, 431 (4th Cir. 2004); see also Chiang v. Verizon New England, Inc., 595 F.3d 26, 36-37 (1st Cir. 2010); Van

5

Veen v. Equifax Information, 844 F. Supp. 2d 599, 605 (E.D. Pa. 2012); Krajewski v. American Honda Finance Corp., 557 F. Supp. 2d 596, 609 (E.D. Pa. 2008). While the question whether an investigation is reasonable "is a factual question normally reserved for trial . . . summary judgment is proper if the reasonableness of the defendant's procedures is beyond question." Westra v. Credit Control of Pinellas, 409 F.3d 825, 827 (7th Cir. 2005); see also Krajewski, 557 F. Supp. 2d at 609; Farren v. RJM Acquisition Funding, LLC, No. 04–995, 2005 WL 1799413, at *7 (E.D. Pa. July 26, 2005).

"Absent allegations of fraud, identity theft, or other issues not identifiable from the face of its records, the furnisher need not do more than verify that the reported information is consistent with the information in its records." Krajewski, 557 F. Supp. 2d at 610; see also Farren, 2005 WL 1799413, at *6 ("The statute does not require . . . any data furnisher to take extraordinary means to investigate and discover disputed information but rather calls for a more passive investigation where the data furnisher is determining only that the information provided to it matches the information in its records."). However, the United States Court of Appeals for the Third Circuit ("Third Circuit") has held that "the reasonableness of a credit reporting agency's procedures is normally a question for trial unless the reasonableness or unreasonableness of the procedures is beyond question." Cortez v. Trans Union, LLC, 617 F.3d 688, 709 (3d Cir. 2010); see also Van Veen, 844 F. Supp. 2d at 605.

Here, Verizon asserts that the record reflects that the only disputes transmitted to Verizon by the CRAs were that Rosen asserted that the account was paid in full prior to it being referred for collection in 2007. (Def.'s Mot. Summ. J. at 21.) Verizon states that because Rosen "submitted admittedly faulty information to CRAs in support of his dispute, which faulty

information was presumably transmitted to defendant, defendant can not be found to have acted unreasonably in refusing to alter its reporting of the delinquent status of plaintiff's account on the basis of information which is admittedly untrue." (Id. at 21-22.) Verizon asserts that Rosen submitted "faulty information" when he disputed the debt on May 16, 2007, to AFNI because on July 23, 2007, Rosen agreed that a portion of the debt in the amount of $76.51 was owed by him and he, subsequently, paid that amount. (Id.)

Verizon further asserts that given its limited duty of investigation of Rosen's dispute "as received from the CRAs, and the absence of any development by plaintiff in the record of this action of the scope of the investigation defendant made into plaintiff's claims to determine that the reporting was consistent with its internal records as to the delinquent status of his account, plaintiff can not prevail on his claim pleaded under the FCRA." (Id. at 22.) Verizon also argues that its billing statements in the record prove that the amount it reported to the CRAs was correct. (Id.)

Rosen contends that there are several genuine disputes of material fact which preclude a summary judgment finding. Rosen argues that one dispute of material fact is the accuracy of the alleged outstanding debt of $78.00 that Verizon reported. (Pl.'s Resp. at 6, 8.) Rosen also asserts that another factual dispute is the date of the termination of his services. (Id.) He argues that he notified Verizon on December 8, 2006, that he wished to cancel all services - internet, landline telephone, and cable. (Id. at 8.) Verizon argues that Rosen requested that only his internet service be terminated as of December 11, 2006, and that his telephone service was to be terminated as of December 20, 2006. (Def.'s Mot. Summ. J. at 5-6.) We agree with Rosen that these issues constitute genuine issues of material fact which preclude summary judgment

regarding Rosen's FCRA claim.

We first note that it is a common complaint among cable television subscribers that it is often very difficult to read and understand the billing statement for this service. This difficulty is compounded when the same company provides internet and telephone services. The same is true here. The parties have submitted numerous billing statements, among other evidence, regarding the services Rosen received during the relevant period in question, and when such services were supposedly terminated. In its Motion, Verizon attempts to explain what each charge means for each particular service, why such services were charged for particular periods, and when certain services were terminated. It may well be that Verizon's explanations and computations of the amounts that Rosen owed for its services and when it terminated certain services are entirely accurate. However, after our own examination of the statements and other evidence submitted, we are unable to ascertain if they are or are not. We, thus, find that Rosen has genuine disputes with regard to the amount Verizon claims he owes and when Verizon's services were actually terminated. We are also unable to conclude that the "reasonableness" of Verizon's investigation of the dispute is "beyond question." Cortez, 617 F.3d at 709.

We first address the issue of when Rosen terminated his services for internet, cable, and landline telephone services. Rosen asserts that it was his intention to cancel all three services when he called Verizon on December 8, 2006. (Pl.'s Resp. at 8.) It is Verizon's position that only Rosen's internet service was terminated on that date, and that because of the nature of switching carriers, Rosen's landline telephone services were terminated after this date. (Def.'s Mot. Summ. J. at 15.) At his deposition, Rosen acknowledged that he did receive an email from Verizon dated December 8, 2006, which indicated that only the internet service was being

terminated. (Id., Ex. F at 31.) The email stated "[t]hank you for allowing us to serve as your Internet service provider. We received your cancellation order effective 2006-12-11." (Id. at Dep. Ex. 2.) We are of the opinion, however, that it was reasonable for Rosen to believe that he was cancelling all three services at the same time when he contacted Verizon on December 8, 2006. Rosen testified at his deposition that he elected to terminate his account with Verizon when the "whole Triple Play thing became popular with Comcast, and I was able to get a good deal with them and pay a lot less money for the same service."[1] (Id., Ex. F at 17.) Rosen was asked whether he intended to keep his telephone landline service with Verizon or Comcast, and he answered that "I was cancelling all three with Verizon and starting all three with Comcast simultaneously." (Id. at 17-18.) Rosen was further questioned whether it was his intent to have no break in service for internet, cable television or telephone during the transition from Verizon to Comcast as the carrier. (Id. at 18.) Rosen replied that "[i]t was just my intent to stop one and start another." (Id. at 19.) Rosen also indicated that he did not recall receiving any other email or communication from Verizon stating that the cable and/or telephone service was being terminated; nor has Verizon produced any.[2] (Id. at 32.)

There are several other factors in this case that add to the confusion as to exactly when Rosen terminated Verizon's services and how he was billed for these services. Patricia Cobb ("Cobb"), Verizon's designee witness on the issues before this Court, testified at her deposition

---

[1] We note that it is common knowledge that there is stiff competition in the market among providers offering consumers specials and packages to leave their cable/internet/home phone provider and switch to another offering better packages and rates.

[2] Moreover, the December 8, 2006 email from Verizon did not offer any instructions to Rosen to do anything further if it was his intention to cancel all three services.

that Rosen's Verizon's account "has an opened date of October 15, 1999," and "a date closed of December 20, 2006." (Id., Ex. H at 11-12.) Cobb didn't offer an explanation why this "closed" date of December 20, 2006, differs from the date in the email of December 11, 2006. Cobb did state that the service and billing dates for internet service on Rosen's account were different than those for his telephone services because the voice services are regulated and the internet services are not. (Id. at 30-31.) However, we are of the opinion that the average consumer would not be aware of such information and/or how it applied to the fees they were charged for these services. In addition, Verizon's billing statements reflect confusing information as to what services were terminated and when. A January 4, 2007 Verizon statement to Rosen indicates under the section entitled "Services Removed," that Rosen was being credited for "Verizon Regional Package Unlimited" that was removed for the period of December 21, 2006, through January 9, 2007. (Pl.'s Resp., Ex. G at 4.) Such statement could easily be read as meaning that all three of the services were cancelled as of December 21, 2006, instead of just internet service being terminated as of December 11, 2006, which is stated in Verizon's email. Accordingly, we find that the dates of the termination of each service Verizon provided to Rosen are genuine disputes of material fact to be decided by a factfinder.

     We next address the issue of the accuracy of the amount of the $78.00 debt Verizon reported to the CRAs. Rosen argues that Verizon's contention that it credited him $24.44 for internet services charged after December 11, 2006 (the date the service was to be terminated) is mathematically impossible based on the statements and disclosures produced by Verizon. (Pl.'s Resp. at 6, 8.) When Rosen was asked at his deposition, what the basis of his belief was that he was being billed incorrectly, he responded that, "[w]e ended our service, and then they billed us

for what I later discovered was an additional week and a half of time; and as my understanding that Verizon bills, and this is just based on my review of older bills, that they work like the newspaper or a magazine subscription that you pay for it first and then get the service. They bill forward." (Def.'s Mot. Summ. J., Ex. F at 22-23.) Rosen further stated that "it was my understanding that at the time I terminated my services, my bill was paid in full for services already provided." (Id. at 34.)

      Cobb confirmed Rosen's understanding that Verizon bills one month in advance. (Id., Ex. H at 26.) Cobb also stated that when a consumer requests a stop to service before a future bill is issued, a consumer is not responsible for that future service and that if a customer requests a service disconnect in December, the customer would have already been billed from November to December. (Id. at 26-27.) Cobb further testified that Rosen's account had a past due balance owed as of January 6, 2007, in the amount of $81.66, and that amount included fees for basic and non basic telephone charges, toll calls, and internet service. (Id. at 13, 15.) However, Cobb did not specify what amounts were charged for each of these services, and it is difficult to match this amount with the figures in Rosen's statements. A review of Rosen's December 10, 2006 bill indicates charges for internet service of $31.57 from December 4, 2006, through January 3, 2007. (Pl.'s Resp., Ex. F.) Moreover, Rosen's January 11, 2007 bill indicates that Rosen was credited the amount of $24.00 for services removed from December 21, 2006, to January 9, 2007. (Id., Ex. G.) However, the statement does not specify which specific services were credited; rather it states services removed as "Verizon Regional Package Unlimited." (Id.) Thus, we find it difficult to understand from this statement whether Rosen was credited for internet service he cancelled effective December 11, 2014, and why he was credited the amount of $24.00.

Verizon asserts that "credits for the unused internet service terminated December 11, 2006, as applied to plaintiff's account are reflected on the VzT Recovery Support screen (Arbor Invoice Management System)." (Def.'s Mot. Summ. J. at 17, n.12.) However, Verizon adds to our uncertainty of the disputed debt by acknowledging that it "credited plaintiff for the pro rated amounts for the internet service on a separate invoice, copies of which are no longer available due to the passage of time since the account was closed in 2006 and suit brought in 2013." (Id.) The explanation may be clear to Verizon, but it is not clear to us, and we can see why it was not clear to Rosen. Accordingly, we cannot conclude that the "reasonableness" of Verizon's investigation of the dispute is "beyond question." Cortez, 617 F.3d at 709. We, thus, find that there remains a genuine dispute as to the amount of the debt which also precludes summary judgment in Verizon's favor with regard to Rosen's FCRA claim.

**2.     Defamation**

Verizon asserts that Rosen's defamation claim should be dismissed on statute of limitation grounds. It is well settled that Pennsylvania law applies to defamation actions in which the plaintiff resides in Pennsylvania. Marcone v. Penthouse International Magazine for Men, 754 F.2d 1072, 1077 (3d Cir. 1985). The statute of limitations for a defamation claim in Pennsylvania is one year. See 42 Pa.C.S.A. § 5523(1). Verizon asserts that Rosen knew no later than May 9, 2007, the date of the first collection letter, that Verizon was reporting a debt to outside collection agencies. (Def.'s Mot. Summ. J. at 24.) Consequently, Verizon argues that Rosen's defamation claim expired no later than May 9, 2008, almost four years before Rosen filed his claim in the Philadelphia Municipal Court. (Id.)

Rosen responds that in May 2007, when he first became aware that Verizon was asserting a past balance owed, he was diligent with Verizon in seeking proof, and after acknowledging a partial past balance owed in July 2007, he continued to dispute the alleged balance Verizon claimed remained due. (Pl.'s Resp. at 13.) Rosen states that because Verizon "did not respond to his letter dated December 27, 2007, rejecting a settlement offer from Defendant's agent, a reasonable jury is likely to find Plaintiff was justified in believing the matter was resolved on the terms he demanded multiple times throughout that year." (Id.) Rosen further argues that the clock on the one-year limitation begins to run as soon as discovery of the injury is reasonably possible, and he could not have reasonably discovered Verizon's defamatory communication until February 22, 2012, when he applied for credit to refinance his house and reviewed his credit report. (Id.)

The discovery rule provides that "where the existence of the injury is not known to the complaining party and such knowledge cannot be reasonably ascertained within the prescribed statutory period, the limitations period does not begin to run until the discovery of the injury is reasonably possible." Gatling v. Eaton Corp., 807 A.2d 283, 289 (Pa. Super. 2002); see also Smith v. IMG Worldwide, Inc., 437 F. Supp. 2d 297, 305 (E.D. Pa. 2006). A court's application of the discovery rule arises out of an "inability of a [plaintiff], despite the exercise of due diligence, to know the injury or its cause." Smith, 437 F. Supp. 2d at 305 (citing Pocono Int'l Raceway, Inc. v. Pocono Produce, 468 A.2d 468, 471 (Pa. 1983)). As an equitable remedy, the discovery rule should be applied only when appropriate and necessary. Id. Moreover, ignorance, mistake or misunderstanding will not toll the statute, even though a plaintiff may not discover an injury until it is too late. Pocono Int'l Raceway, Inc. 468 A.2d at 471; see also Wolk v. Olson,

730 F. Supp. 2d 376, 378 (E.D. Pa. 2010).

     Here, we find that Rosen should have been reasonably aware of a possible defamation action against Verizon in May 2007, and no later than November 2007.  As noted earlier, on May 9, 2007, AFNI, a debt collector acting on behalf of Verizon, notified Rosen of an alleged debt owed by Rosen to Verizon, and on July 23, 2007, Rosen agreed that a portion of the debt was owed by him.  Am. Compl. ¶¶ 7-8, 10.  In addition, on November 28, 2007, another debt collector acting on behalf of Verizon, Park Dansan, notified Rosen of an outstanding debt of $78.83 and offered that Rosen pay $47.40 in full satisfaction of this alleged debt.  Id. ¶ 11.  Rosen rejected this offer in a letter dated December 27, 2008, and continued to dispute the debt.  Id. ¶ 12.  Rosen asserts that he never received written or oral communications from Verizon or any entity acting on behalf of Verizon following his rejection of the offer in his December 27, 2007 letter.  Id. ¶ 13.

     We, however, are of the opinion that it was unreasonable for Rosen to come to the conclusion that Verizon's pursuit of the debt simply went away after his rejection of the offer to settle the debt.  We find that Rosen should have known of a possible defamation claim against Verizon no later than the November 28, 2008 letter from Park Dansan in which, once again, Verizon attempted to collect a debt that Verizon believed was not satisfied by Rosen's partial payment in July 2007.  Because Rosen's defamation claim was filed several years after this date, we find that this claim is barred by Pennsylvania's one-year statute of limitations.  Accordingly, we grant summary judgment in favor of Verizon on this claim only.

## IV. CONCLUSION

We find that there are genuine issues of material fact with regard to Rosen's FCRA claim as to the amount of the debt claimed by Verizon and the dates of the termination of its services. Accordingly, we deny summary judgment for this claim. We, however, find that Rosen's defamation claim is barred by Pennsylvania's one-year statute of limitations, and grant summary judgment as to this claim.

An appropriate Order follows.